### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF FLORIDA

#### CASE NO. 25-CV-22582-RAR

**JUAN VALERO LLORENTE**, and
**AFRICA LLORENTE HORCAJO**,

      Petitioners,

v.

**AMAL EL AHMADI EL BENAYE**,

      Respondent.

_____/

### ORDER DENYING PETITION FOR RETURN OF MINOR CHILDREN

Sometimes it is possible to feel someone else's fear.  When the fear is so pervasive that it shadows every word someone says, haunts the corner of their eyes, and radiates in their every movement—it is the type of fear another person can feel.  And it is the type of fear exhibited by the Respondent in this action, Amal El Ahmadi El Benaye, in nearly every moment she appeared before this Court.

Amal El Ahmadi El Benaye, proceeding *pro se*, came before the Court upon her ex-husband's Verified Petition for Return of Minor Children, [ECF No. 1], ("Petition") pursuant to the Convention on Civil Aspects of International Child Abduction done at the Hague on October 25, 1980 and the International Child Abduction Remedies Act, 22 U.S.C. § 9001 *et. seq.*  Along with his mother, Africa Llorente Horcajo, Petitioner Juan Valero Llorente filed the Petition seeking return of the minor children, J.V.E.A. and A.V.E.A. ("the Children"), of which he and El Benaye are the parents.  Petitioners currently reside in Spain while El Benaye, who is twenty weeks pregnant, lives with the Children, her husband, and the Children's siblings in Florida.  Petitioners allege El Benaye wrongfully removed the Children and requests the Court return them to Spain.

In response, El Benaye claims the removal was not wrongful; that the Children, who have been in Florida for over a year, are well-settled in the state; and that if they were returned to Spain, they would face a grave risk of harm.

On July 22, 2025, the Court conducted a bench trial in this matter, hearing from numerous witnesses, including the Children, and found in favor of El Benaye as explained herein. Accordingly, it is hereby

**ORDERED AND ADJUDGED** that the Petition, [ECF No. 1], is **DENIED**.

<u>**FINDINGS OF FACT**</u>

From the moment Amal El Ahmadi El Benaye entered the courtroom for the Initial Show Cause Hearing on June 17, 2025, [ECF No. 11], an air of anxiety hung about her. At that hearing, El Benaye broke down in tears trying to explain that she could not go back to Spain because she had fled an abusive ex-husband whose vast criminal dealings had caused her to receive death threats—and that she feared for her life. *Id.* As El Benaye would go on to recount through both written submissions to the Court and in the evidence and testimony she presented during the Final Evidentiary Hearing, [ECF No. 63], held on July 22, 2025, she had been beaten, stalked, manipulated, and threatened many times over in the years she had known Mr. Llorente. She feared for her own life if required to return to Spain, as well as the lives of her eight and nine-year old daughters.

### I. *Background*

El Benaye and Llorente met in October of 2014, when he was approximately 38 years old, and she was approximately 22 years old; they began living together two months later. Pet., [ECF No. 1], ¶ 15. Shortly thereafter, El Benaye became pregnant with their eldest daughter, J.V.E.A. *Id.* ¶ 16. On June 20, 2016, El Benaye and Llorente were married in Madrid, and around that time, El Benaye became pregnant with the couple's second child, A.V.E.A. *Id.* ¶¶ 17–18. The exact

details of how their relationship began are unknown, though El Benaye alleges it began when Llorente—who was in prison at the time—"developed an obsession with her" after seeing her on TV when she was 18 and sought to meet her through "contacting mutual friends until he managed to meet her personally."  [ECF No. 32] at 4.

The marriage of El Benaye and Llorente was marred by violence.  Throughout her testimony, El Benaye consistently and credibly described her ex-husband as "aggressive" and as a man "capable of doing anything."  Tr. at 65.  She described outbursts of anger, violence, and the fury he would show when he became enraged and "lost control."  Tr. at 147.  El Benaye had proof of Llorente's violence and rage against her, in addition to the testimony she provided.  And her friends and family that testified all spoke to the violence and abuse she had experienced.  El Benaye described incidents in which Llorente would become enraged and punch and beat her.  She described one incident in which he cornered her in the kitchen with a knife.

She described another incident in which he followed her in his car, threatening to run over her.  She shared photos of herself, which showed a large and significant bruise on her cheek, which she explained came from Llorente punching her in the face.  Indeed, the bruise, which covered a significant portion of her cheek and jawline, was shaped like a fist.  El Benaye submitted two photos showing this bruise.  Resp't Ex. 1.  In the first one, dated March 13, 2017, with a timestamp of around 8:00 p.m., she is shown getting out of the car at night, lit by the bright streetlights, with baby A.V.E.A. in her arms.  The metadata indicates that the photo was taken in the Palomas neighborhood of Madrid.  The second photo, dated four days later on March 17, 2017, was taken indoors around 1:00 p.m.  El Benaye is sitting on a couch, leaning down toward the camera and holding baby A.V.E.A. in her lap; baby J.V.E.A., who is old enough to sit up by herself at this point, sits next to El Benaye and her little sister.  The bruise is even more visible in this photo, and with the passage of four days, has darkened considerably.  This photo also shows that it was taken

in Palomas.  When testifying about this photo, El Benaye explained: "That was at my home, when Juan—we were arguing.  You can see the girls are small.  Instead of arguing, he would hit me as if I were a man."  Tr. at 145.

El Benaye also submitted a video, which she stated was taken on July 22, 2017, of Llorente assaulting her.  Though the video is only three seconds long, it shows Llorente coming at El Benaye, who testified that she recorded the video.  At first, the video shows only the upper part of El Benaye's bent leg, as if the phone is hidden while she sits on a bed.  But then Llorente, dressed in khaki shorts and a gray t-shirt, appears at the end of the bed, visible at first only from the shoulders down, but in an aggressive posture with hands outstretched.  As the video progresses, Llorente is shown coming around the side of the bed, where El Benaye is sitting.  For a brief glimpse, the camera is angled down, and a blue, green, and orange crib appears.  Through the mesh netting on the side of the crib, the thigh of a baby is seen, and it becomes obvious that one of the girls, still wearing diapers, is in the room as Llorente assaults El Benaye.  In the penultimate moment, the camera turns back up, toward Llorente and finally his face is visible, eyes shadowed and face scowling.  The last images are blurry, as Llorente's left hand reaches toward the phone camera, which then flips up toward the ceiling and then back toward the crib.  The video ends with a blurry image of a fist centered in the frame.  El Benaye testified about what happened once the video ended: "He grabbed me.  He hit me.  Those are the only evidence that I have.  This is not the only episode that has happened.  Many episodes [] have happened with him."  Tr. at 147.

In addition to El Benaye's account, her friend since 2012, María Durán Martínez, testified as to the ongoing violence El Benaye experienced.  Durán Martínez described supporting El Benaye as she experienced a pattern of violence, and a life mired in fear.  Durán Martínez detailed one incident in which she was called by El Benaye to come pick her up after Llorente had assaulted her.  She relayed her experience driving to the house where the couple lived in Madrid and seeing

El Benaye running out of the house, distraught, in tears, and clearly injured.  She described this as "the only time [she] saw it" herself, indicating there were many other times she knew about violence against El Benaye.  Tr. at 99.  El Benaye's husband, Edgardo Centeno Llopiz, also testified that he had seen photos and videos that made it clear Llorente had "beat her."  Tr. at 121.

Llorente stated in the initial Petition that he lived with El Benaye and the Children until January 2017 when he and El Benaye separated and filed for divorce.  Pet. ¶ 17.  However, the photos were taken after that date, and El Benaye stated the video was taken when she lived with Llorente in July of 2017.  It is not clear if Llorente is misrepresenting when the couple separated, or if the beatings continued after the separation.  The divorce became final on July 18, 2018.  [ECF No. 1-1].  In February of 2019, Llorente and El Benaye entered into a Joint Custody Agreement, which El Benaye testified she agreed to under duress.  [ECF No. 1-2].

As detailed in the record, Llorente's aggressive temper and threats of violence were not limited to El Benaye—nor to when they were married.  El Benaye described threats against her sister and her family to prevent them from testifying or supporting El Benaye in legal proceedings before both the Spanish courts and this Court.  Court records show that when called to testify, both El Benaye's mother and brother appeared but "pursue[d] [their] right not to testify."  [ECF No. 1-11], at 12–13.  El Benaye also testified that, just as Llorente had threatened her with his car, he had threatened her sister, harassing and following her with his car while she was pregnant.  El Benaye explained that after this incident, her sister cut off all contact with her to prevent retaliation from Llorente.

Most importantly, Llorente has threatened his own children.  El Benaye's husband, Llopiz, testified that he was once present for a phone call between Llorente and the Children, during which one of the girls called Llopiz her father.  This enraged Llorente—"he got furious . . . he was filled

with anger, with wrath"—who then threatened to punish his daughter.  Llopiz explained the phone call:

> And the girl was talking to him and mentioned to him that I was her father, her dad, and he became furious.  He said that when he will come out of jail, he would punish her, that I was not her dad, which was something I didn't understand, why he was getting like that, because no one wants to take from him his position as a father.  But that's something that you have to [] earn.

Tr. at 124.  El Benaye also testified that she thought Llorente was a danger to the girls: "From the time they [were] little girls, [] he has mistreated and abused the children in my presence . . . When he's arguing with you, he doesn't know how to discuss things verbally.  He will hit the walls.  And he doesn't care who is in front of him at that point in time.  That's just the way he is."  Tr. at 55.

The danger from Llorente comes not only from his own penchant for violence, in El Benaye's telling, but also from his vast criminal dealings.  She avers that the choices he has made—selling cocaine, conspiring and affiliating with convicted criminals and gang members, and becoming a police informant—have put both her and the girls in danger.  At the time of the Final Hearing, Llorente was on supervised release from prison, where he had been incarcerated for participating in a drug trafficking conspiracy.  *See generally* Pet. Ex. 18.  El Benaye has consistently and credibly maintained, in all her filings with the Court, and throughout the entire bench trial, that she fears for her life because of death threats she has received from Llorente's criminal associates.  The existence of these threats and their impact on her were corroborated by her husband.  Both testified that the threats on El Benaye's life and that of the Children is the primary reason they left Spain.  *See* Aff. of Amal El Ahmadi El Benaye, [ECF No. 33], ¶ 7 ("I cannot return to Spain.  The risk to my life and the lives of my children is real and grave.").

Sometime in January of 2024, El Benaye was approached by unknown individuals in a vehicle while in Madrid.  According to both El Benaye and her husband, who testified as to the

impact this event had on El Benaye, these individuals threatened to kill her and the Children because of Llorente's criminal involvement—specifically, because he became a police informant. Two weeks after this threat was delivered in person, Llorente fled Spain with her children.  Resp't Ex. 19.

But this threat was only one of many El Benaye testified about, and even discussing the threats seemed to send her into a panic.  She described another threat, received over the phone since she has been in the United States, in which someone told her that they would kill Llorente— and if not him, they would kill her and the Children.  When asked who threatened her, she alternated between testifying that it was Llorente's associates, that she did not know, or that she could not say because "nobody is protecting me."  Tr. at 164.  Every time she was asked about the final threat delivered in Spain, which she appeared to be too afraid to even bring up on her own (her husband first mentioned it during the trial), she would immediately stiffen and start crying. The consistency and pure emotion with which she responded leaves the Court convinced that these threats are real.

El Benaye also testified that she closed her social media accounts when she came to the United States because of the threats and feared she would be contacted through them.  Llorente tried to present the closing of her accounts as El Benaye's attempt to hide the girls, but she denied this, explaining that: "I was afraid of being contacted through the media . . . social media.  I was not considering or hiding the girls.  I came here with a legal visa and legal tickets."  Tr. at 164.

El Benaye maintains that she and her daughters are in grave risk of danger not only because Llorente is a violent domestic abuser, but also because the criminal life he has cultivated puts her and the girls at risk by association.  *See* Aff. of Amal El Ahmadi El Benaye, [ECF No. 33], ¶ 8 ("Given his criminal background and dangerous associations, it is reasonable to believe that his life is at risk—and by extension, so is ours.  Returning would place us in serious danger.").  El

Benaye describes Llorente's involvement in a vast criminal network through which Llorente would traffic drugs as part of an organization that included a security operation out of a Spanish department store, El Corte Inglés—the majority of which has been corroborated by a Spanish court. *See generally* Resp., [ECF No. 19]; Aff. of Amal El Ahmadi El Benaye, [ECF No. 44]; Pet'r Ex. 18, JUDGMENT NO. 2/2024.

Llorente was, at the time El Benaye left Spain, incarcerated because of his involvement in a drug trafficking operation. The lengthy final judgment that resulted in his incarceration details his participation in a criminal organization related to the commission of crimes against public health, specifically trafficking cocaine. Along with twelve others, Llorente was found "criminally responsible" for "a crime against public health, in the form of drug trafficking, involving a substance that causes serious damage to health (cocaine), in quantities of notorious importance and extreme gravity, committed by persons belonging to a criminal organization." Pet'r Ex. 18 at 133. For this crime, Llorente was sentenced to nine years and one day in prison and a fine of €19,511,180. *Id.* He was deemed a participant and a leader in the criminal organization, and was held responsible for his recidivism, as this was his second conviction for a crime against public health. *Id.* at 5–6. Llorente is further described as a "most trusted collaborator" of his co-defendant, who "maintained personal contact with South American cocaine suppliers," *id.* at 18, and was described as the leader of a group of cocaine distributors, *id.* at 20.

Llorente was also found to steal cocaine from the packages before delivering them to the buyer. His co-defendant said he tolerated the fact that Llorente "steals from everyone" because "it's worth it for all he sells you." *Id.* at 25. The judgment even details the role of the security guard at the El Corte Inglés, which El Benaye explained would send Llorente CCTV footage of her so that he could track her movements and control her. *Id.* at 23. Lastly, the judgment notes

the mitigating circumstance of his "late confession"—corroboration that Llorente was, as El Benaye alleges, a police informant. *Id.* at 133.

Llorente also briefly testified at the Final Hearing over Zoom. During the few moments that he spoke, he came across as defensive and disinterested. When asked by his own counsel if he knew María Durán Martínez, he replied: "This woman lied. I only saw her one time." Tr. at 107. His counsel had to ask him three times if he knew Durán Martínez and on the third attempt, he replied with "I only saw her once in my life. I know Amal knows her because they were living together in London while they were working as strippers." *Id.* at 108. When he accused his ex-wife of working as a stripper—an unsupported allegation—El Benaye's eyes visibly widened in disbelief, and she slowly shook her head. Llorente's answers to his own counsel during direct questioning were cursory and distant. When asked if he ever threatened El Benaye or his daughters with physical violence, he would curtly reply "never, never at all" or "never, I would never think of that." Tr. at 104. When asked if he was aware of any threats made to El Benaye from his associates in prison, he gave his longest answer of any, explaining that "it's not possible to call someone from jail" and that "it's not possible to send threats" because of the security. *Id.* Given that Llorente is still on supervised release, the Court understands why he would not be willing to admit that it is possible to make phone calls from inside prison, but the Court does not find such an assertion credible.

Llorente testified that he is now out of prison, but on a form of supervised release in which he must report to a specific location by 10:00 p.m. on weeknights for overnight observation. He also stated that he is allowed to sleep at his own home on weekends; he did not say how long he would be required to be on supervised release. He explained that he has a job as a "coordinator for a fleet of Uber drivers," and that his employer knows about his criminal history. Tr. at 105. When asked who would care for the Children if they returned to Spain while he was on supervised

release, Llorente replied that his twenty-two-year-old son would care for them, along with his mother and his brother, Roberto Valero, who is two years younger than Llorente. Tr. at 110. After answering this question, Llorente ended his testimony, thanked the Court, and then promptly exited the bench trial to report for his supervised release.

## II.    *Life in the United States*

In the seventeen months since El Benaye fled Spain with her Children and husband, the family has resided together in Broward County. [ECF No. 20]. Both J.V.E.A. and A.V.E.A. are performing exceptionally well in school, where they have received awards and commendations from their teachers for their academic accomplishments. Report cards admitted into evidence corroborate testimony regarding the girls' strong academic performance. Resp't Ex. 3. Both children are fluent in English and have always attended school in English. One of El Benaye's friends, Silvia Matylde Lozada, testified that she has known the girls since they were little and always spoke in English with them because they really enjoyed it and engaged with the language. Both girls now report that they are very happy at their home in Florida; so happy, in fact, that they no longer think of Spain as "home," and they do not wish to return there. When asked during the Final Hearing, J.V.E.A. described how much she enjoys taking classes in rhythmic gymnastics, and A.V.E.A. repeatedly expressed enthusiasm for going to the park with her stepfather and siblings. Tr. at 157.

The girls' attachment to their life in the United States was confirmed by both El Benaye and her husband Llopiz. El Benaye described the girls as "super happy" with their life in the United States, and stated that ever since they arrived here, her daughters have been doing very well. Tr. at 154. Llopiz described the girls as "delighted" to be in the United States, explaining that they have made friends, are excellent students, and enjoy their after-school activities, including rhythmic gymnastics and trips to the park. Tr. at 133.

Llopiz, a U.S. citizen, explained that the girls have already been enrolled in Charter School of Excellence for the upcoming schoolyear, and he expressed a strong commitment to providing for his children and pregnant wife.  Tr. at 134.  Llopiz has been providing for El Benaye and the girls since 2021.  He explained that he works two jobs to support his wife and children financially, and the family recently moved to a house with three bedrooms, "so the family can be a little more comfortable."  Tr. at 139–40.  He explained that when they moved, they made sure to choose a place that would allow the girls to stay at the same school.  El Benaye confirmed that both girls have attended the same school the entire time they have been in the United States.  Resp't Ex. 3.

Both from El Benaye's evidentiary submissions and from the girls' own testimony, it is abundantly clear to the Court that, to the girls, "family" consists of their mother, their baby brothers, and their stepfather—not Petitioner, and not anyone residing in Spain.  Petitioner submitted a recent drawing made by J.V.E.A. depicting her family at the park.  Resp't Ex. 4.  The figures in her sketch are smiling, each labeled with their names—her sister and two younger brothers, "Mama," and "Papa."  A.V.E.A. even referred to Llopiz as "Dad" when interviewed by the Court, and cards made by the girls addressed to "Papa" confirm the connection between Llopiz and the Children.  Resp't Ex. 5.

El Benaye also submitted a litany of family photos to the Court, spanning the family's time in Spain up to the present—photos of the girls at the park, celebrating birthdays, and at the pool— with many including Llopiz.  Resp't Ex. 4.  Among these is a picture taken in a photography studio, seemingly a family holiday portrait.  In the image, J.V.E.A. clings to Llopiz's leg in matching pajamas, grinning.  In another from the same day, A.V.E.A. rests upon Llopiz's shoulders and smiles toward the camera.  Another series of photos shows the girls out with their whole family along the water at night.  One image shows Llopiz with the youngest brother atop his shoulders as he walks behind the girls who have run ahead, each holding the hand of their other brother so that

they form a chain.  A second image shows El Benaye following close behind pushing the boys'

empty stroller.  At the Hearing, both children emphasized that they love spending time with their

family and taking care of their younger brothers.

The Court has no doubt that, to the girls, Llopiz is "dad," and Llopiz cares for them as their

father.  When asked to provide their last names to the Court, both girls initially hesitated.  When

asked why they were hesitating, both explained that they wanted to change their last names to

match that of their stepfather.  Furthermore, Llopiz testified that he is in the process of adopting

the girls and has consulted with an attorney on accomplishing that goal.  Contrary to Llorente's

assertions, J.V.E.A. and A.V.E.A. do have strong family ties in Florida: to their mother, to their

dad, Llopiz, and to their younger brothers.

### III.   *The Petition*

The Petitioners make several claims in their Verified Petition and Bench Memorandum.

First, they assert that the Children's habitual residence is Spain, which El Benaye does not dispute.

Second, Petitioners assert they both have "rights of custody" as defined in the Hague Convention

as to the Children.  While the Petitioners attach declarations from Spanish courts that Llorente has

custodial rights, the assertion that the grandmother, Horcajo, has rights of custody hinges on the

visitation rights she received from a Spanish Court.  *See* JUDGMENT Nº 437/2022, [ECF No. 1-

5].  Specifically, Petitioners assert that "Petitioner Africa Llorente Horcajo has custody rights, *or

at a minimum rights of access* . . . ."  *See* Pet'rs' Bench Memo, [ECF No. 40], at 4 (emphasis

added).

Petitioners also assert that they were exercising their rights of custody at the time of

removal, and that the removal was wrongful because, although Llorente was in prison at the time

of the removal, his custodial rights were not terminated.  *See* Pet. ¶ 31 ("The mere fact that the

father is in pre-trial detention does not prevent the joint exercise of parental authority in accordance

with Article 156 of the Civil Code, meaning decisions may be made by both parents or by one with the express or tacit consent of the other." (quoting ORDER NO. 323/2022, [ECF No. 1-4], at 8)); *id.* ¶ 32 ("The Court also found that the Mother had de facto custody of the Children 'solely for the duration of the father's pre-trial detention' and that '[s]hared custody shall resume immediately and automatically when the father is granted prison leave or is released, and the visitation schedule shall likewise be reinstated under the same terms.'" (quoting ORDER NO. 323/2022, [ECF No. 1-4], at 10)); *id.* ¶ 38 ("The Spanish court went on to find that 'the custody provisionally granted to the mother during the father's incarceration did not authorize her to relocate the minor children to another country.'" (quoting COURT ORDER No. 39/2025, [ECF No. 1-10], at 13)).

In response, El Benaye asserts that the removal was not wrongful because she had sole custody while Llorente was incarcerated and that his rights would only exist once he was released. *See* Aff. of Amal El Ahmadi El Benaye, [ECF No. 33], ¶¶ 2–3.  In support of this assertion, El Benaye relied on a variety of court documents granting her custody while Llorente was incarcerated.  *See* ORDER NO. 323/2022, [ECF No. 1-4], at 10 ("Temporarily award custody of the minor daughters J and A to the mother, solely for the duration of the father's pre-trial detention."); JUDGMENT Nº 350/2023, [ECF No. 1-6], at 10 ("Certainly, de facto custody shall be granted to the mother while the father remains in provisional detention, without prejudice to the automatic and immediate reinstatement of joint custody and the visitation regime established in the referenced divorce judgment during periods in which the father enjoys penitentiary leave or upon regaining his freedom."); *id.* at 11 ("To provisionally award custody of the minor daughters J and A to the mother, exclusively while the father is provisionally deprived of liberty."); ORDER NO. 156/2024, [ECF No. 1-8], at 6 ("The father of the minors, J, born, and A, born, whose custody is held provisionally by the mother while the father remains deprived of liberty, pursuant to the provisional measures order dated October 6, 2022 . . .").

Second, El Benaye asserts her daughters would face a grave risk of harm if returned to Spain.  On this point, she makes a variety of claims, including that Llorente domestically abused her, psychologically manipulated her, and tracked her movements throughout Madrid through his criminal ties; that Llorente is a violent person and that the daughters would be in danger because of his furious temper; that he has intimidated witnesses and threatened her family members that remain in Spain to cut ties with her and to not testify in her aid; that Llorente's affiliations with "Los Miami" and other criminal organizations endangers both her and the Children; and that she has received death threats, many times over, from Llorente's criminal associates because of his criminal ties and history, causing her to flee Spain in fear for her life.

El Benaye also argues that her daughters are well-settled in their home in Florida, where they live with her, their stepfather, and their two younger siblings.  She explains that they are doing well in school, like the school they have attended the entire time they have lived here, and that they have made friends.  She notes that her husband is in the process of officially adopting the girls and that they are close with him and their stepbrothers.  She also asserts the Children have begun the process of becoming American citizens, as has she (her husband is an American citizen, from Puerto Rico).

## **LEGAL STANDARD**

"The Hague Conference on Private International Law adopted the Hague Convention in 1980 [t]o address the problem of international child abductions during domestic disputes." *Monasky v. Taglieri*, 589 U.S. 68, 71 (2020) (citation and internal quotations omitted).  "Under the [Hague] Convention, an individual may petition a court authorized to exercise jurisdiction in the place where a child is located for the return of the child to his habitual residence in another signatory country." *Chafin v. Chafin*, 742 F.3d 934, 936 (11th Cir. 2013).  The Hague Convention applies to "any child who was a habitual resident in a Contracting State immediately before the

breach of custody or access rights." *See* Hague Convention, art. 4; *see also Taylor v. Taylor*, No. 10-61287, 2011 WL 13175008, at *5 (S.D. Fla. Dec. 13, 2011), *aff'd*, 502 F. App'x 854 (11th Cir. 2012) ("Rights of custody include rights relating to the care of the child and the right to determine the child's place of residence.").

"The Convention and [the implementing legislation] empower courts in the United States to determine only rights under the Convention and not the merits of any underlying child custody claims." *Baran v. Beaty*, 526 F.3d 1340, 1345 (11th Cir. 2008) (internal quotations omitted); *see also Abbott v. Abbott*, 560 U.S. 1, 9 (2010) ("A return remedy does not alter the pre-abduction allocation of custody rights but leaves custodial decisions to the courts of the country of habitual residence."). "[T]he Convention provides the non-abducting parent with a remedy of return, intended to restore the parties to the pre-abduction status quo and deter parents from crossing borders in search of a more sympathetic forum for child custody proceedings." *Id*. at 1345 (citing *Hanley v. Roy*, 485 F.3d 641, 644 (11th Cir. 2007); *March v. Levine*, 249 F.3d 462, 468 (6th Cir. 2001); *Friedrich v. Friedrich*, 78 F.3d 1060, 1063–64 (6th Cir. 1996)).

"When a parent files a petition for the return of a removed child, the first question courts must ask is whether the removal was wrongful.  If so, the child must be returned 'forthwith' unless the respondent establishes one of the affirmative defenses enumerated in the Convention." *Baran*, 526 F.3d at 1344; *see also* Hague Convention, art. 12 ("Where a child has been wrongfully removed or retained in terms of Article 3 and, at the date of the commencement of the proceedings before the judicial or administrative authority of the Contracting State where the child is, a period of less than one year has elapsed from the date of the wrongful removal or retention, the authority concerned shall order the return of the child forthwith.").  "[T]he 1-year period in Article 12 of the Hague Convention is not subject to equitable tolling." *Lozano v. Montoya Alvarez*, 572 U.S. 1, 18 (2014).

One of the enumerated affirmative defenses is the well-settled exception, which does not require the return of the child if the child is well-settled in the new environment. Hague Convention, art. 12 ("The judicial or administrative authority, even where the proceedings have been commenced after the expiration of the period of one year referred to in the preceding paragraph, shall also order the return of the child, unless it is demonstrated that the child is now settled in its new environment."). Another is provided by Article 13(b), which provides for the so-called grave risk of harm exception: "[T]he judicial or administrative authority of the requested State is not bound to order the return of the child if the person . . . wh[o] opposes [the child's] return establishes that . . . there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation."

Moreover, the Convention specifies the burdens of proof required at each stage. Specifically, "ICARA [] provides that a petitioner has the burden to show by a preponderance of the evidence that the petitioner was exercising custody rights at the time of the removal and that the removal was wrongful," *Lops v. Lops*, 140 F.3d 927, 936 (11th Cir. 1998), while "[t]he respondent opposing a child's return bears the burden of establishing the grave risk exception by clear and convincing evidence." *Baran*, 526 F.3d at 1345. And "if more than one year has passed since the wrongful removal and the respondent proves by a preponderance of the evidence that the child is now settled in its new environment, the return of the child may be refused." *Seaman v. Peterson*, 766 F.3d 1252 (11th Cir. 2014) (internal citations omitted).

"These affirmative defenses are to be narrowly construed to effectuate the purposes of the Convention and, even if proven, do not automatically preclude an order of return." *Baran*, 526 F.3d at 1345. Importantly, "the Convention sets as a primary goal the safety of the child." *Golan v. Saada*, 596 U.S. 666, 684 (2022), *judgment entered*, 213 L. Ed. 2d 1107 (June 29, 2022); *see*

*also Baran*, 526 F.3d at 1348 (explaining the Convention places "a higher premium on children's safety than on their return").

Finally, "[t]here is no prohibition on looking to a child's testimony for issues besides the mature child exception, nor is there any need for an affirmative authorization from the Hague Convention to do so." *Romero v. Bahamonde*, 857 F. App'x 576, 581 (11th Cir. 2021).

## ANALYSIS

As stated on the record at the end of the Final Hearing, [ECF No. 63], the Court found that the Removal was wrongful because the Petitioner,[1] Juan Valero Llorente, proved by a preponderance of the evidence that Spain was the habitual residence of the Children prior to their removal; that the removal was in breach of custody rights under Spanish law; and that he was exercising his rights as defined by the Hague Convention.  The Court then explained that the Respondent, Amal El Ahmadi El Benaye, had proven by clear and convincing evidence that the Children would face a grave risk of danger if returned to Spain because of Llorente's domestic violence and associational criminal risk, and that she had proven by a preponderance of the evidence that the Children were well-settled in their new environment.  Because the Court found that two exceptions had been sufficiently proven, the return of the Children to Spain is not warranted and the Petition must be denied.

### I.   *The removal of the Children from Spain was wrongful.*

The Court begins with a fulsome explanation of why the removal was wrongful under the Hague Convention.  To establish his *prima facie* case, Petitioner was required to prove by a preponderance of the evidence that (1) the Children were habitual residents of Spain immediately

---

[1] Petitioner Africa Llorente Horcajo possessed no rights of custody as defined under the Hague Convention because her visitation rights do not qualify.  *See Furnes v. Reeves*, 362 F.3d 702, 714 (11th Cir. 2004) (explaining what rights of custody are under the Hague Convention).  Accordingly, Petitioners' counsel voluntarily withdrew her claim at the Final Hearing and the Court's analysis focuses only on Llorente.

before their removal, (2) the removal was in breach of custody rights under Spanish law, and (3) Petitioner was exercising rights of custody. *See Chafin*, 742 F.3d at 938. Petitioner Juan Valero Llorente established a *prima facie* case.

As an initial matter, it is undisputed that the Children's habitual residence was Spain prior to the removal. Only the second two elements, whether the removal was wrongful and whether Llorente was exercising his rights, were disputed. "The Convention defines a 'wrongful' removal or retention as one that breaches existing custody rights 'under the law of the State in which the child was habitually resident immediately before the removal or retention' if those rights 'were actually exercised' or 'would have been so exercised but for the removal or retention.'" *Golan*, 596 U.S. at 670 n.1 (quoting art. 3, Treaty Doc., at 7)). "In analyzing whether a parent has custodial rights under the Hague Convention, it is crucial to note that the violation of a single custody right suffices to make removal of a child wrongful." *Furnes*, 362 F.3d at 714, *abrogated on other grounds by Lozano v. Montoya Alvarez*, 572 U.S. 1 (2014). "That is, a parent need not have 'custody' of the child to be entitled to return of his child under the Convention; rather, he need only have one right of custody. Further, he need not have a sole or even primary right of custody." *Id.* at 714–15. "Article 3 of the Convention specifies that the removal or retention of a child is wrongful if it is in breach of 'rights of custody attributed to a person . . . *either jointly or alone*.'" *Id.* at 715 (citing Convention, art. 3(a) (emphasis added)).

Here, Llorente clearly has rights of custody. *See* COURT ORDER No. 39/2025, [ECF No. 1-10], at 13 (explaining "the custody provisionally granted to the mother during the father's incarceration did not authorize her to relocate the minor children to another country"). El Benaye is correct in saying that she temporarily had sole custody while Llorente was incarcerated, but given that the suspension of his rights was temporary and his rights were set to "automatically and immediately" reinstate upon his release means that he has rights as defined by the Convention.

*See* ORDER NO. 323/2022, [ECF No. 1-4], at 10 ("Shared custody shall resume immediately and automatically when the father is granted prison leave or is released, and the visitation schedule shall likewise be reinstated under the same terms.").  It may be that his rights were suspended and he did not have *de facto* rights of custody, but he maintained, as made clear by the rulings of the Spanish courts, that he enjoyed *de jure* custody rights as to the Children.

It is also clear that Llorente was exercising his custodial rights.  For starters, "a person [who] has valid custody rights to a child under the law of the country of the child's habitual residence . . . cannot fail to 'exercise' those custody rights under the Hague Convention short of acts that constitute clear and unequivocal abandonment of the child."  *Bader v. Kramer*, 484 F.3d 666, 671 (4th Cir. 2007).  This is so because of the nature of the rights and how they interact with the presumptions within the Hague Convention.  "[T]he nearly universal approach taken by courts faced with the question of the exercise of custody rights" is to "'liberally find exercise whenever a parent with *de jure* custody rights keeps, or seeks to keep, any sort of regular contact with his or her child[]'" which "avoids the need to distinguish between *de jure* custody and *de facto* custody." *Id.* at 671 (citing *Sealed Appellant v. Sealed Appellee*, 394 F.3d 338, 344–45 (5th Cir. 2004); *Baxter v. Baxter*, 423 F.3d 363, 370 (3d Cir. 2005)).  This approach aligns with the directive to not reconsider or relitigate the underlying custody dispute, by not evaluating the nature of the custodial rights to determine whether such rights have been exercised.  Accordingly, Llorente's repeated attempts to maintain contact and custodial rights—before, throughout, and after his incarceration—clearly exhibit sufficient exercise under this standard.

Since it was undisputed that the Children's habitual residence was Spain prior to removal, Llorente was only required to prove by a preponderance of the evidence that the removal was wrongful and he was exercising his rights.  He met his burden at the bench trial, thereby establishing that removal was wrongful.

## II.  The Children will face a grave risk of harm if returned to Spain.

The Court turns to whether the Children will face a grave risk of harm or otherwise place them in an intolerable situation if returned to Spain.  *See Baran*, 526 F.3d at 1345 ("Whether a grave risk of harm to a child exists under the terms of the Hague Convention is a mixed question of law and fact[.]").  This question is complicated because the Court is confronted with a relatively rare situation.  *Cf. Taylor*, 2011 WL 13175008, at *9 (describing a case as "somewhat unique" where the father's "dishonest dealings [] previously caused his family to come under threat of physical harm, even death, from third parties acting outside the legal system").  El Benaye alleges grave risk on two fronts—the violence she personally experienced as a survivor of domestic abuse and the danger she and her Children face due to her ex-husband's repeated and extensive criminal activities.  Ultimately, the Court finds that El Benaye has met her burden by clear and convincing evidence that the Children would face a grave risk of harm or otherwise be placed in an intolerable situation if returned to Spain.

"To deny return, [a] district court [is] not required to find [the child] had previously been physically or psychologically harmed; it [is] required to find returning [the child] would expose h[er] to a present grave risk of physical or psychological harm, or otherwise place h[er] in an intolerable situation."  *Baran*, 526 F.3d at 1346.  This provision is not "intended to be used by defendants as a vehicle to litigate (or relitigate) the child's best interests," and "[o]nly evidence directly establishing the existence of a grave risk that would expose the child to physical or emotional harm or otherwise place the child in an intolerable situation is material to the court's determination."  Hague International Child Abduction Convention; Text and Legal Analysis, 51 FR 10494-01.  "For 'grave risk' to be established, the potential harm must be 'a great deal more than minimal,' and the risk of that harm must be 'grave.'"  *Taylor v. Taylor*, 502 F. App'x 854, 856–57 (11th Cir. 2012) (quoting *Walsh v. Walsh*, 221 F.3d 204, 218 (1st Cir. 2000)).  As the official

report[2] of the Convention explains: "[T]he interest of the child in not being removed from its habitual residence . . . gives way before the primary interest of any person in not being exposed to physical or psychological danger or being placed in an intolerable situation."  Elisa Pérez Vera, Explanatory Report: Hague Conference on Private International Law, in 3 Actes et Documents de la Quatorzieme Session 426 (1980) ("Pérez Vera Report"), ¶ 29.  "The clear and convincing evidence standard demands more than the preponderance of the evidence standard, but is not as exacting as the beyond a reasonable doubt standard; the party who bears the burden of proving something by clear and convincing evidence must convince the trier of fact that her claim is 'highly probable.'" *Taylor*, 2011 WL 13175008, at *8 (citing *United States v. Owens*, 854 F.2d 432, 436 n.8 (11th Cir. 1988)).

Here, the Court has no doubt that the risk of harm to the Children if they returned to Spain is a great deal more than minimal—it is grave.  And while this case is somewhat unique in that the risk of harm comes from both the father and from anonymous threats, it is not unprecedented.  *See Taylor*, 502 F. App'x at 857 (affirming the district court's denial of the return petition where the risk of harm came "not only from threats made by her father but also from threats made by an unknown third party"); *see also id.* at 857 (holding district court's findings not clearly erroneous where the petitioner's criminal "activities have already created—and likely will continue to create—a substantial risk of serious harm to [petitioner's] family").

First, Llorente is a danger to his Children as evidenced by the threat he made to punish his daughter, coupled with video evidence of him assaulting El Benaye in the presence of their baby. Indeed, El Benaye credibly testified that Llorente does not hesitate to resort to violence, loses

---

[2]  "Pérez–Vera was the official reporter of the Hague Conference and her report is recognized as the official history and commentary on the Convention and is a source of background on the meaning of the provisions of the Convention."  *Gomez v. Fuenmayor*, 812 F.3d 1005, 1012 (11th Cir. 2016).

control, and does not care who is around once he becomes enraged. If the Children are present when he becomes enraged, the Court finds it highly probable that the girls could become the targets of violence—and such exposure to violence would prove intolerable. Further, the Court does not find Llorente's assertions—that he never harmed or threatened El Benaye and does not know of any threats against her—to be credible. Not only is there photo and video evidence indicating otherwise, but there is also copious credible testimony that he repeatedly beat her. His testimony is less credible because his history of deception is so vast—his own co-defendants in a conspiracy to traffic cocaine said he was known to "steal[] from everyone." Pet'r Ex. 18 at 25; *see also Taylor*, 502 F. App'x at 855 (affirming and accepting the district court's explicit factual findings that petitioner was "untrustworthy" and "that his testimony was not credible in a number of areas . . . [g]iven [petitioner's] long history of deception and fraudulent activity").

Second, the sum of Llorente's life choices creates a risk to anyone who knows him—especially his daughters, who could be used as leverage by anyone seeking revenge against him. *See, e.g.*, *Taylor*, 2011 WL 13175008, at *9 (finding a child "would face a 'grave risk' of physical and/or psychological harm and/or face an 'intolerable situation' if she were returned to the United Kingdom where her father's business associates, victims, or lenders would be able to use her as 'leverage' to help recover the debts they are owed (or believe they are owed)"). El Benaye alleges the risk of harm comes from Llorente's continued criminal activities and the fact that he became a police informant. Ultimately, whether the threat to Llorente and consequently his Children is because he became a police informant or because he is still involved in a drug trafficking network is of no moment. Either situation presents the same danger to the girls. The Court is not suggesting that because Llorente has multiple criminal convictions he poses a risk; it is Llorente's association with people who threaten violence against him—or his Children—that poses a grave risk. *See Taylor*, 2011 WL 13175008, at *9 ("Those who threatened Mr. Taylor and Ms. Taylor in late 2008

in an effort to force repayment would not hesitate to threaten to kill, kidnap, or do physical harm to A.T. in order to get Mr. Taylor to pay what he owes.  In fact, those third parties would likely think that the only way (or the most persuasive way) to force payment by Mr. Taylor would be to go after his daughter if she was living in the United Kingdom.").

El Benaye exhibited *sheer terror* when describing the threats she had received for mere association with Llorente, even after they were divorced.  When faced with the potential loss of her daughters, she said she could not divulge who made the threat that caused her to leave Spain because "nobody is protecting me."  El Benaye has already faced grave risk and an intolerable situation because of Llorente; the Court does not hesitate to conclude the same would befall the Children.

### III.   The Children are well-settled in their new environment.

Though the Court already finds one exception to return satisfied, the Court also concludes that the Children are well-settled in their new environment, where they have lived for well over a year within a strong and stable family unit.

Whether a child is well-settled is a totality-of-the-circumstances inquiry.  *Fernandez v. Bailey*, 909 F.3d 353, 361 (11th Cir. 2018).  "[A] child is settled within the meaning of ICARA and the Convention when a preponderance of the evidence shows that the child has significant connections to their new home that indicate that the child has developed a stable, permanent, and nontransitory life in their new country to such a degree that return would be to the child's detriment."  *Id.* at 361.  "To this end, nothing less than substantial evidence of the child's significant connections to the new country is intended to suffice to meet the respondent's burden of proof."  *Id.* at 361 n.5.

Here, the Court finds the Children have abundant and significant ties to their new country.  First, there was ample testimony that they love speaking in English.  They have also stably been

attending the same school since they arrived in Florida, and when the family moved, they made sure to stay within the same area so that the girls could stay in the same school. Both girls are receiving excellent marks in school and their teachers submitted letters indicating they are active, engaged, and well-behaved students. The girls have developed a good routine with hobbies, such as going to the park every day with their stepfather, Llopiz, after school and attending rhythmic gymnastics classes.

Most important, however, is their family unit. Llorente attempted to say that the Children have no family here, only in Morocco and Spain (though El Benaye testified that he had made them cut contact with her family in Morocco). But, while the girls may not have the extended family of Llorente and his relatives in the United States, they unequivocally have a family here. Llopiz, who is a U.S. citizen, has been their primary caretaker and father figure since 2021, when they lived in Spain, and he is clearly the person both girls consider to be their dad. They call him Papa, they make him cards, they draw family photos with El Benaye and Llopiz depicted as Mama and Papa, with their little brothers present, too. They both want to change their last names to be like his. *See, e.g.*, *Anderson v. Acree*, 250 F. Supp. 2d 876, 882 (S.D. Ohio 2002) (finding that the child was well-settled when she wanted to change her name to her stepfather's). For nearly half of their lives, Llopiz and El Benaye have been their parents. They are both so clearly settled here, within a loving and stable nuclear family, that returning them to Spain would mean breaking up a family—not reuniting one.

## CONCLUSION

Given the Court's determination that the Children would face a grave risk of harm if returned and they are well-settled in the United States, the Court declines to order the Children returned to Spain. Accordingly, it is hereby

**ORDERED AND ADJUDGED** as follows:

1.      The Petition, [ECF No. 1], is **DENIED**.

2.      The Clerk of Court shall **RELEASE** the Children's passports to Respondent.

3.      Any pending motions are **DENIED as moot**.

4.      The Clerk of Court is instructed to **CLOSE** this case.

**DONE AND ORDERED** in Miami, Florida, this 31st day of July, 2025.

_____

**RODOLFO A. RUIZ II**
**UNITED STATES DISTRICT JUDGE**